We have four cases to be argued on the appeals calendar today. I am told that all are present. I would remind everybody that Judge LaValle is on screen. So to make sure that you're also watching him to see if he has questions, I will be doing my best to monitor everything here and keep the trains running. Mr. Graziano, is that correct? And I believe that you have reserved two minutes for rebuttal. Is that correct? Correct. Are you ready? Yes. Please. Good morning. May it please the court, Salvatore Graziano for Moab Cargoes. In this securities case, throughout the class period, the officers of Macquarie made materially misleading statements, repeatedly describing their largest business known as IMTT as not sensitive to industry trends or production, never revealing or warning that, in fact, they were extensively relying on one type of storage of number six oil, where demand and production, in fact, was threatened and did go down as a result of pending IMO 2020 sulfur cap regulations. At the beginning of the class period, which is in February of 2016, the CEO of this company says that their business is inherently more stable, that it is uncorrelated with the exploration and production in the oil industry. That was false when made. In fact, because the defendants admitted any disclosure of their large amount of number six oil storage, they gave a half-truth where that specific type of product was going to be made less because of these changes going on in the industry, and the industry was going to hit a wall at some point before 2020 when these regulations would take effect. Over 40% of IMTT's storage was in this number six oil. And the defendants, when they spoke about their supposed uncorrelation and unsensitivity to what was going on in oil exploration and production, said a half-truth because, as to number six oil, there was a great relationship there between what was going on. And in their briefs, my colleagues say, absolutely not correct. This company repeatedly said that it stored black oil. Black oil, Your Honors, is not the same as number six oil. Black oil is a much more inclusive term, and even as to black oil, IMTT never said how much black oil it stored. It listed it in a long list in its forms, 10K, but black oil includes other things, such as vacuum oil. Vacuum oil wasn't at issue in this IMO 2020 regulation. Number six oil, the oil that was the most toxic and the one that was being phased out, is the heaviest form of black oil. It's the heaviest form of fuel oil. So it is not the same to disclose black oil and number six oil, but even as to black oil, there was no numbers given. Counselor, can I ask a question? Would you concede that the ship owners and refiners had various options and under at least one of them, the industry could keep using high sulfur fuels? Yes, they did, and they could have installed, I think, something like a million dollars per ship. What they term in the industry is scrubbers, and that would have been a way out of this. But what we do know is that there was great risk for this company. When you look at item 303, I mean, this is a classic case. Well, the question that I have, and I'm so sorry for cutting you off, is that if we're, I'm experiencing this as you're asking us to infer that defendants knew which direction the market would head when they're not storage or service providers, or not ship owners, or not refiners, and for them to have some precision as to how this would affect it. When you just conceded that ship owners and refiners had a few different options. I don't think it's fair to say that in this case the executives had to know which way things were going to go. I don't think that's fair at all. I think if you look at item 303 and you look at some of the things they said, but let's start with item 303. Was this an uncertainty? Absolutely. Was it reasonably likely to have material favorable impact on their revenues? Absolutely. Item 303 would be a nullity if they had to know for certain. If it had to have already happened as the district court ruled. So item 303 would be taken out of effect. But here also, Your Honor, what did they say? They said they had the least exposure when it came to oil and gas. They said that this was not a place where their customers would store products to play contigo or backwardation games. But in fact, at the end of the class period, they said a meaningful contingent of their customers actually were these kinds of commodities traders who had low barriers to exit, who quickly jumped out of the market when No. 6 oil hit this wall that everyone saw was coming. And back to your question, Your Honor, the solution Your Honor identified was one solution. Another solution that in fact occurred at the end of the class period was less No. 6 oil was actually being produced. So there was even less on the market. And that is said in paragraph 184 of the amended complaint by the new CEO who says what happened, it all relates to No. 6 oil. And in paragraph 184, he says less of this product has now been produced as a result of these changes in the industry. More specifically, the storage utilization, the storage rates at the company started to decline. So in November, the lead plaintiff asks the investor relations person Davis at the company how much of this was in this form of product. And there's just a completely false statement given, which is it's about 20%. And at the motion to submit stage, that statement should be written. That statement should be read as written, and about 20% was false. It was more than double that number. Then six days later, the same person says this company has very little in crude or asphalt, any heavy product. The district court said, well, that's a reference to crude. But at this stage, I think the word should be read as written. I'm sorry to say that again. At this stage. I think the words should be read as said, as written. And this spokesperson from Macquarie said very little, any heavy product. I mean, that's what he said. And you see the reaction. I understand correctly that part of your part of your contention that you devoted to number six oil number six. If they needed to be converted to another use, they could not be converted without nine months of expensive. Correct, Your Honor. So another refrain from this company was how nimble they were, how they could store. One thing for their customers one day and then switch to something else. But in fact, this kind of product raised two problems for them. Number one, the extensive amount of time to clean the tanks because it was so sulfur heavy. But number two, the size of their tanks made them especially dependent on this business because they were so large that they were cost prohibited to store other kinds of products. So that goes back to how dependent this company was on storing number six oil. They had four 500,000 gallon, million gallon tanks that, you know, would really be limited for other uses in the industry. And, you know, just in my one minute left, I think this is a case where once we show disclosures required under Item 303 or because of the kinds of statements they made, Sienter easily follows here. Absolutely, we have to show a strong inference of Sienter. But the entire industry was talking about IMO 2020. Their competitors were all warning about it. This was the one company that stayed silent. So for Sienter- May I ask you before you finish? I want to take what you were talking about before you answer Judge LaValle's question about the very little crude petroleum products. What this report said was that Davis had already drawn a distinction between petroleum products and crude products. And that distinction has to inform a reading of the statement you're relying on or that you're suggesting supports your claim. I understand your argument that the words should be read to mean what they say, but not by taking them out of context. Why shouldn't we also put them in the context as the district court did? The page we're talking about in terms of his comments- They mean- The page where these comments appear in the record is 638 of the joint appendix. Right. And I think, Judge Raji, if you read them in context, there is no question as to what this man is talking about. And I think the district court was simply incorrect. He is- No way. I mean, are you saying Davis didn't draw the distinction or that they're attenuated? I just want to be sure I understand what your argument is on this one. I don't mean to drill down on one single point, but you did make it. This statement happens to be very important, so I'm glad we're spending a minute on it. If I could just finish my answer, I think when you look at the comments he made in the context on page 638 of the joint appendix, there is no question this man is telling the market that this company is storing very little of any heavy product. That is what he's saying. I think the district court just completely misread this page. We didn't have an oral argument. We didn't have a chance to explain it to the district court. Well, he says very little crude, right? No, no. He says there's two points when he speaks, and the first time he's talking about what they store, and he says primarily refined petroleum products. Right. We do very little in crude. You can think of that as parenthetical. Then he goes on. Chemicals and agricultural products, those are all things this company stores. Right. Then later in his statement, he says a little over half of the capacity is in service and petroleum products, and as I say, very little of that is in crude or asphalt, any heavy product. So it's the any heavy product that you want us to focus on? Correct. And we know in paragraph 165 of the complaint, and we know in paragraph 262 of the complaint, Davis had said similar things. This isn't the only time he's denying the extensive amount of number six oil this company is storing, and this is a motion to dismiss, and we should get the benefit of the way this language is written. At least at this stage we can have discovery. But he said it three times, all around the same time, that they had very little of this product. It's unexplainable what he did other than deceive investors. Thank you. Thank you, Mr. Garziano. Mr. Schreiber. Thank you, Your Honor. May it please the Court, I'm John Schreiber of Winston & Strachan. We represent Macquarie Infrastructure Corporation, a defendant in this case, which for ease of reference I'll simply refer to as Macquarie, as counsel did. We also represent the individual defendants who are former officers and directors of Macquarie or its former operating segment IMTT. Today I'll be speaking on behalf of all of the defendants, so that also includes Macquarie Infrastructure Management USA, or MIMUSA, as I'll refer to them, as well as Barclays Capital, who was the underwriter on a secondary offering in 2016. That is, unless the panel has any questions specifically for counsel for those entities, they are present and prepared to respond to any such questions. In my limited time today, I want to focus on two overarching issues that we think require affirmance of the district court's decision. One of those is scienter, which applies to all of plaintiff's claims under the Exchange Act. The district court dismissed the Exchange Act claims both for failure to allege any actionable misstatement or omission, such as the statement we were just talking about from Mr. Davis, but also on the alternative overarching ground of a failure to plead a strong inference of scienter. As this court explained in Novak and has since repeated in Stratton McClure and other decisions, scienter should not be found where defendants merely should have anticipated future events and made certain disclosures earlier than they actually did. That, at best, we would submit is the situation here. Rather, what the plaintiff needed to allege for purposes of scienter are facts that approximate actual intent to deceive, manipulate, or defraud investors. That is something that this court has pointed out encompasses deliberate illegal behavior. We submit that the court below got that correct, that there are not facts alleged to create such a strong inference of scienter here. Am I correct that to the extent that your argument relies on scienter, it has no application to the 33 Act claims? Well, so that any claim which is barred under the 34 Act by reason of inadequate pleading of scienter is nonetheless valid under the 33 Act. That is the only reason for disqualifying it under the 34 Act. That is absolutely correct, Your Honor. And so to close the loop on the Exchange Act claims, we think scienter is an overarching basis on which the dismissal can be affirmed. Let me ask you further about one of the claims. As I understand it, one of his statements was to the effect that the only clients they have are exclusively big oil companies which are not going to think out on their contracts. And in fact, they had a number of traders, oil traders, who when problems developed with Linda Six Oil, they just dropped out. Certainly, Your Honor. And during the class period, as we pointed out, McCrory and IMTT did disclose that they had traders as customers. They did say that it was a small percentage. And the statement on which plaintiffs rely suggests that it was at most 20% is the disclosure at the back end of the class period. So it remains correct that the vast majority, overwhelming majority of the customers here were not traders. Unless there are any other questions on scienter, I would, particularly in light of Judge LaValle's questions about the Securities Act, move to those claims. And in particular, Item 303 of Reg S.K. The Securities Act claims are based on an alleged omission in a registration statement that was issued in connection with a 2016 secondary offering. And the alleged omission, according to plaintiff, arises from a duty to disclose under Item 303. Now, Item 303 has been amended a few times in the last few years. The language as it existed during the relevant time is as set forth in this court's decision in Strat McClure, starting at page 101. And specifically, what Item 303 required at the time is for a company to describe known trends or uncertainties that the company reasonably expects will have a material, unfavorable impact on revenues or income. The SEC has subsequently made clear that this is a subjective test. The current language of the rule, which is what plaintiffs cite in their briefing, states that this disclosure is to be based on management's assessment. So management's actual assessment that there are matters reasonably likely to have a material impact on future operations. In other words, this is not the assessment they should have made or could have made, but the assessment they actually made and what they actually expected. And there, we submit, are no allegations, factual allegations, demonstrating that as of November 3rd, 2016, when this secondary offering was completed, that McCrory had already made that conclusion and reached that expectation. But isn't the question reasonable, though, right? The question is not, as I understand it, whether or not they had made that conclusion, but what was reasonable for them to have concluded based on everything that they knew at that point? The language is reasonably expects, and as I've indicated, the SEC has made clear that that is based on management's assessment. And I believe this court's decision has made clear- But it has to be a reasonable assessment. It does. I mean, they couldn't have some bizarre assessment. So it's subjective, but it has to be a reasonable one. I think that's right, Your Honor. All right. So how are they supposed to plead that? Are they supposed to plead that by saying that if they believed X, it would have been bizarre to believe that? Or can they just plead on information and belief, given that it's something in their adversary's mind? How are they supposed to plead it? I think they need to allege some facts to show that this is actually what management had concluded. They do have former employees as sources here. That's not uncommon in the securities context. Conceivably, it could be alleged based on subsequent disclosures. I'm sorry. I'm sorry. This is important, so I just want to make sure I get it. It seems to me in your last statement you collapsed both the question that I raised and the question that Judge Raggi raised to say it was, again, whether or not management actually had that belief as opposed to whether or not they reasonably had that belief. And there's a lot of information that your colleagues on the other side are putting out there that suggests somebody should have known that this was coming, especially sophisticated actors. So if you could comment on that. I will, Your Honor. Let me speak to that. To go to the reasonable point, at this time, particularly in November of 2016, for Macquarie to have predicted, made this negative prediction would have been at odds, not supported by its then current experience and its historical experience. As we've laid out in our brief, the demand, global demand for the commodity six oil had been going down for a long time, including after IMO 2020 was announced in 2008. During that time, storage, demand for storage at IMTT's facilities of that same commodity was going up. And ultimately, Your Honor, this goes to one of your questions to counsel earlier, this was a situation where the impact was uncertain. We're talking about regulations that would go into effect in 2020. And the industry, some predicted doom and gloom. Others, including Macquarie, as plaintiff has pointed out, saw some possible upside. And I would submit, Your Honor, that this is a situation like the one this court described in footnote six of Stratt Macquarie, which is a situation that involves anticipating a future trend or anticipating a less predictable impact of a known event, trend or uncertainty. As this court points out in Stratt Macquarie footnote six, the SEC treats that situation differently. It is an optional disclosure, not a required disclosure. And that's where things stood, certainly in November of 2016. And we would submit throughout the class period. And on that point about uncertainty, plaintiffs have pointed to one of Macquarie's peers or competitors, Volpac, for discussing IMO 2020 at some point. Well, they didn't do that until November of 2017, still a year after the secondary offering. And all they said at that time was that the result of IMO 2020 was uncertain. That's one of these optional disclosures that the SEC and this court treat as different. And the failure to wade into that territory is not actionable. I have one question. Can you help me harmonize some areas of the law that I don't see as fitting particularly neatly together? I'll do my best. One is the idea of the uncertainty that you are putting forth out there to help explain away what was reasonable. The other part is whether or not these assurances that you were given thus lessen the impact of the disclosures that you actually did give because of risk assessment. Can you help me square that? Which assurances are you referring to? Well, the optimism, right, the predictions. Because what they're arguing is that you were being overly rosy, and then that lessens what you actually are claiming, that you disclose what you're also saying is sufficient. So how do those different parts of the law come together? Certainly, Your Honor. And a couple of points on that. In terms of anything optimistic the company said, we would submit and we'd brief that those statements were literally true. Again, this is a company that stored and handled bulk liquids. It did not buy or sell them, so the notion that they were not directly exposed to price fluctuations is true. They had contracts that called for a certain payment for a certain period of time, a number of years, and that's what they got paid. So if the price went up or down over the next quarter, it made no difference. So that's what they meant there. And, again, historically, for a very long time, the price and demand for No. 6 oil as a commodity had been going down, even before IMO 2020 was announced in 2008, continuing after 2008, all the way through the class period. And during that time, up until the very end of 2017, IMTT, and by extension, McQuarrie, was experiencing all-time highs in utilization rates, including for 6 oil. So its experience was that there was no correlation to that point. They had seen no correlation between the demand for the commodity 6 oil that its customers traded in or bought and sold for usage and their experience in selling storage space. Okay. I don't—I'm sorry. Are you hearing me? Yes, we sure do. To the extent that you focus on the notion that it's a subjective test and they must have actually believed it, coming back to, I guess, what Judge Rogers said, how do we believe that? It seems to me that if it is correct, as the complaint was, 40 percent of the capacity, a huge amount of storage, is devoted to this number 6 oil, and come 2020, it will be illegal to use that oil, except if very expensive scrubbers are employed, which almost undoubtedly means that there's going to be a substantial change in the demand. And given the circumstance that these 40 percent, this 40 percent capacity cannot be turned over to another usage without nine months of cleaning and processing, I don't see how the management can have failed to appreciate a big risk to their revenues when 2020 rolls around. And you were saying, well, demand is increasing. Demand for capacity at the defendable storage tanks was increasing during the preceding years, but come 2020, that is going to be different. I don't see what the problem is of leading at this stage actual awareness. Well, Your Honor, I would submit they haven't actually pleaded that. And frankly, this is a situation where the plaintiff is asking the court to hold McCrory liable for not inaccurately predicting the future. This is 2016, and we were talking then about what they should have known about what would happen in 2020. This is one product. Well, I mean, that would be a question for the fact finder at the trial. Did they actually believe they couldn't be held liable for failing to predict? But if the fact finder would find that they did perceive this enormous threat, enormous likelihood, and for their storage tanks and the problem that would result in view of the huge quantity of their storage capacity devoted to this, the finder would have to find whether it's a question of what they knew, what they believed, or just failure to predict, in which case the plaintiff would lose. Well, and Your Honor, the last point I'll make is it's a failure to predict something that never came to pass. What actually happened after the class period in late 2018 is McCrory concluded and subsequently began disclosing in every quarterly filing thereafter that it expected increases, not decreases, in storage utilization and demand related to the implementation of IMO 2020. So they did not jump the gun when they were not convinced that there was going to be this negative impact, and ultimately it didn't happen. Let me ask you, Judge LaValle, I don't know if you know your question. You were breaking up some, so I want to pursue the point a bit. We're not trying the case, and we're not predicting what would happen if it were to go to trial, but the question is are the pleadings sufficient to support a claim that your client knew or certainly that it would have been unreasonable not to know at the time the statement was made that it faced a tremendous risk or a very likely risk of declining demand here? Now, as Judge LaValle, I think you should have heard him say at the very end, of course, if a fact finder were to conclude that this was just a good faith but wrong prediction, your client could not be liable. But don't the facts pleaded support a claim that your client either actually knew that there was a risk of diminution of demand or that it would have been unreasonable not to know in these facts and circumstances? How are we supposed to consider that? The complaint certainly doesn't plead facts that they actually knew and actually expected this material, unfavorable impact to result three years later. And we would submit it also does not allege that they should have known that, should have predicted it at the time. Again, as I know... Well, why not for the reasons Judge LaValle laid out? Why wouldn't it be, why wouldn't a fact finder be able to conclude that it would have been unreasonable not to have seen this risk? Because it was contrary to the company's actual experience to that date, not supported, but contrary to the company's actual experience, which continued for another year after the secondary offering. So that is one point. And in the industry, plainness can... But it seems to me the point that you're making isn't valid because the period in which it wasn't happening was prior to the moment when the boom would come down on number six oil in 2020. Which I think, as I pointed out, Your Honor, also didn't end up happening. This is all about predicting the future. This is not an impact that was already being felt or even one that the company had concluded is likely to be felt in a material way. They had not made that conclusion. And again, I'll point out the court's decision in Stratton McClure, footnote six. The SEC distinguishes between these two situations and requires far more certainty for the item 303 obligation to kick in. That's a situation where there is a known event that the company has concluded it reasonably expects to have a material unfavorable effect. The different situation where there's an optional disclosure is where a company is faced with a situation of anticipating a less predictable impact of a known event. We would submit that's the situation that we were in here. That's an optional disclosure, not one that gives rise to a duty under item 303. Thank you so much. Just a couple of brief points. My colleague does drift away from the pleading and make factual arguments which are not part of the record. For example, at the end of the fourth quarter of 2018, the amount of storage had declined to 82% at this company. It was historically at 96% during the class period. They cut their dividends substantially. I'm referring to paragraph 226 of the complaint. There is no support for the argument that they didn't lose storage of number six oil. That is, in fact, the opposite of what the complaint says. More importantly, the larger shareholder advisory service ISS, similar to Judge LaValle, was harshly critical of this company because its story didn't make sense at the end of the day. It was hard to understand how the company could be saying what it was saying during the class period. No prediction is required in this case, and I think that's a point I'd like to emphasize. This is not a case about predicting the future. This is a case about disclosing a trend or uncertainty that is reasonably likely to have a material impact on this corporation. Every one of this company's competitors disclosed this starting in 2013, not 2018, 2013. And that's in paragraph 98, 133, 136, 143, 151, and 160 of the complaint. Repeatedly, the competitors were out there warning of this problem coming down the road with IMO 2020. Did they have to know the exact date when it would hit them? No. But they knew and didn't disclose that over 40% of their storage was in number six oil. They knew but didn't disclose that a meaningful contingent of their customer base were these commodities traders with very low barriers to exit. The stock drop when the disclosure is made is also something the court can consider in terms of the materiality. It went down by over 40% in this court's jurisprudence. That reaction by the market is further proof that this was a violation of item 303. In terms of their- I'm not sure I follow that. I mean, that would suggest that, you know, every time there's a drop in the market that they would have known. No, I- No, I don't think you're making that argument. No, I'm making the argument about materiality. Was this a material event? Clearly it was. This company lost nearly half of its value, billions of dollars. That's my point there. I understand. Thank you, Your Honor. Thank you so much. We will take this case under advisement. We will next hear from counsel in Mejia Lopez Velazquez v. Garland. Thank you. We have Mr. Usher and Mr. Calhoun. Mr. Usher, you have reserved three minutes for rebuttal. Is that correct? Three minutes for rebuttal. We are ready when you are, sir. Good morning, Your Honors. May it please the Court. My name is Mike Usher. I represent the petitioners in this case. This case comes before the Court on a petition for review from a decision from the Board of Immigration Appeals, which overturned or vacated a grant of asylum by the immigration judge here in New York City and ordered the petitioners deported without any further proceedings. It is the position of petitioners that the Board of Immigration Appeals erred in their decision by finding that the petitioner didn't experience any past persecution, didn't have a reasonable fear of future persecution, did not belong to a cognizant particular social group, and wasn't entitled to either withholding of removal or protections of the Convention Against Torture. And further, even if there were to be further review,